**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Pedro Alicea, | : |
| | : |
| Plaintiff, | : Civil Action |
| | : |
| v. | : No. 22-_____ |
| | : |
| City of Philadelphia, Detective John | : Jury Trial Demanded |
| Ainsley, Detective Charles Brown, | : |
| Sergeant Joseph Descher, Police Officer | : |
| Miguel Deyne, Lieutenant Gibbons, | : |
| Lieutenant James Hansen, Police Officer | : |
| Oscar Martinez, Detective McGlothin, | : |
| Detective Frank Miller, Detective Robert | : |
| Snell, Sergeant Robert Snyder, and | : |
| Sergeant Frederick Westerman, | : |
| | : |
| Defendants. | : |
| | : |

## COMPLAINT

### I.     Preliminary Statement

1.      This matter concerns the extraordinary misconduct of Philadelphia Police Department (PPD) detectives who caused the wrongful arrest, prosecution, conviction, and thirty-one-and-a-half-year imprisonment of plaintiff Pedro Alicea for a double murder he did not commit.

2.      Mr. Alicea was arrested in 1989 and charged with the February 1985 murder of two brothers, Hector and Luis Camacho.  He had nothing to do with the crime, and, in fact, was more than 1,500 miles away in Puerto Rico when the crime occurred in Philadelphia.

3.      The detectives had compelling evidence early on establishing exactly who committed the crime: a neighborhood drug dealer named Wilson Santiago and his brother Manuel Santiago.  The Santiago brothers had been feuding with the Camacho brothers over their

inter-connected drug businesses. However, with witnesses reluctant to provide information about well-known, violent neighborhood drug dealers, the investigation languished.

4.      After failing for years to move forward on prosecuting the true perpetrators, and with pressure building to close old cases, detectives chose a convenient target: Mr. Alicea. The defendants did not identify him as a possible suspect until four years after the crime occurred, when Mr. Alicea moved from Puerto Rico back to Philadelphia, in close proximity to the location where the Camacho brothers were murdered.

5.      Mr. Alicea was known to lead investigator, Officer Miguel Deyne, as, several years prior, when living in Philadelphia, he had testified as a witness in an unrelated prosecution brought against a man Deyne had arrested. Mr. Alicea's testimony as a witness made clear that Deyne was lying when Deyne claimed he saw the man handling a gun during a traffic stop, leading to the man's acquittal.

6.      Deyne and his fellow detectives leaned on vulnerable individuals to create false evidence implicating Mr. Alicea in the Camacho brothers' murders. They coerced a repeat informant, Angel Fuentes, with whom Officer Deyne had a longstanding personal and business relationship, to endorse a fabricated statement claiming—for the first time, four years after the murders—that he had driven by as the incident occurred and that he observed Mr. Alicea shoot the Camacho brothers.  They also coerced Reinaldo "Ray" Velez, who had himself been implicated in the shooting, into endorsing another false statement identifying Mr. Alicea as the shooter.

7.      In their quest to fabricate a case against Mr. Alicea, the defendant officers hid from prosecutors critical evidence pointing to the true perpetrators, including the statement of a reliable eyewitness confirming that the Santiago brothers murdered the Camacho brothers.

8.      Mr. Alicea was convicted in a nonjury trial before then-Common Pleas Judge Theodore A. McKee.

9.      Shortly after the conviction, evidence came to light showing that Fuentes had lied in his trial testimony about the benefits he received from police and that Deyne, likewise, had downplayed in his testimony the steps that he and other officers took to help Fuentes in return for his cooperation with their efforts to prosecute Mr. Alicea.  Based on this new information, and given the substantial weaknesses in a prosecution case based solely on the testimony of two polluted witnesses, Judge McKee issued an opinion concluding that the conviction should be vacated, and that Mr. Alicea should receive a new trial.  On appeal, however, state appellate courts did not accept that ruling, and Mr. Alicea's conviction and sentence remained in place.

10.      In the decades that followed, Mr. Alicea tried to prove his innocence and challenge his conviction by gathering evidence establishing that he was living in Puerto Rico from 1982 through 1986.  One particular piece of evidence provided a precise alibi, confirming that on February 19, 1985, the day the Camacho brothers were shot and killed, Mr. Alicea was working at a grocery store in Juana Diaz, Puerto Rico.

11.      Despite the presentation of this new evidence, as well as multiple other efforts to obtain relief, Mr. Alicea's post-conviction challenges were deemed untimely.  For more than three decades, he remained incarcerated in the Pennsylvania Department of Corrections, separated from his family, while his children, who were in elementary school at the time of his arrest, grew into adults and had children of their own.

12.      In August 2018, there was a significant break in Mr. Alicea's unsuccessful efforts to obtain a new trial.  An attorney in the appellate unit of the Philadelphia District Attorney's Office, while preparing to submit a brief in then-pending federal post-conviction litigation,

undertook a detailed review of the 1,000-page PPD file on the Camacho brothers' murder. In that file, the attorney located reports and information that had been hidden from prosecutors and the defense since the beginning of the case: investigative materials pointing to the Santiago brothers as the actual perpetrators of the murders.

13. In December 2018, the District Attorney's Office sent the newly discovered materials to Mr. Alicea. He had never seen them before. He had never learned at any point during the course of his prosecution and imprisonment that police had investigated the Santiago brothers as alternative suspects, let alone that they had developed a compelling case against them.

14. With this information in hand, Mr. Alicea was finally able to prove that the evidence against him was fabricated by police. He initiated post-conviction litigation, and, following a concession from the Philadelphia District Attorney's Office that he was entitled to relief, on October 23, 2020, a judge in the Philadelphia Court of Common Pleas vacated the conviction. On that same date, based on the view of the District Attorney's Office that there was not sufficient evidence to charge Mr. Alicea, the Court of Common Pleas approved a nolle pros of the charges. Mr. Alicea, who was 41 years old at the time of his arrest in March 1989, was released on October 26, 2020, at the age of 73.

15. Mr. Alicea's conviction for a crime he did not commit was the direct result of the defendant detectives' fabrication of evidence, malicious prosecution, and intentional suppression of exculpatory information. As seen in multiple other cases involving exonerations of people convicted of murders they did not commit, these actions were the natural product of the City of Philadelphia's long historic practice of failing to train, supervise, and discipline detectives in the

PPD Homicide Division to comply with clearly established constitutional obligations and the City's acquiescence to established customs of improper police practices.

16.     The defendants' collective actions and inactions caused Mr. Alicea substantial damages. Through his three-plus decade imprisonment, he experienced physical pain and suffering, emotional trauma, financial losses, and the deprivation of his liberty and enjoyment of life. Mr. Alicea brings this action asserting civil rights claims under 42 U.S.C. § 1983 and supplemental state law claims under Pennsylvania law seeking compensation for these harms and losses.

## II.     Jurisdiction

17.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

## III.    Parties

18.     Plaintiff Pedro Alicea, age 74, was at all times relevant to this Complaint a resident of Philadelphia, Pennsylvania. Mr. Alicea was arrested, charged, and convicted in this case under the name Antonio Martinez, a name attributed to him by police for reasons that he does not know. This Complaint refers to him by his true name, Pedro Alicea.

19.     Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department, which, at all relevant times, employed the below individual defendants.

20.     Defendant Detective John Ainsley, Badge No. 681, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

21. Defendant Detective Charles Brown, Badge No. 9136, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

22. Defendant Sergeant Joseph Descher was, at all times relevant to this Complaint, a sergeant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

23. Defendant Police Officer Miguel Deyne, Badge No. 1606, was, at all times relevant to this Complaint, a police officer assigned to the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

24. Defendant Lieutenant Gibbons was, at all times relevant to this Complaint, a lieutenant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

25. Defendant Lieutenant James Hansen, Badge No. 297, was, at all times relevant to this Complaint, a lieutenant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

26. Defendant Police Officer Oscar Martinez, was, at all times relevant to this Complaint, a police officer assigned to the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

27. Defendant Detective McGlothin was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity

28. Defendant Detective Frank Miller, Badge No. 732, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

29. Defendant Detective Robert Snell, Badge No. 646, was, at all times relevant to this Complaint, a detective in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

30. Defendant Sergeant Robert Snyder, Badge No. 8619, was, at all times relevant to this Complaint, a sergeant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

31. Defendant Sergeant Frederick Westerman was, at all times relevant to this Complaint, a sergeant in the Philadelphia Police Department's Homicide Division. He is sued in his individual capacity.

32. At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff.

33. At all times relevant to this Complaint, all defendants acted under color of state law.

## IV. Facts

### A. The Camacho brothers are shot in Philadelphia while Mr. Alicea is living in Puerto Rico.

34. On the afternoon of February 19, 1985, Wilson and Manuel Santiago shot and killed Hector and Luis Camacho on the 2200 block of North 4th Street in the West Kensington neighborhood of Philadelphia.

35. The Santiago brothers and the Camacho brothers were involved in drug trafficking. The Santiago brothers sold drugs out of a candy store they owned, located at 2229

North 4th Street. The Camacho brothers also sold drugs, often buying their supply from the Santiagos. The Santiago brothers killed the Camacho brothers because of disagreements about their drug trafficking operations.

36.     Mr. Alicea had nothing to do with the crime. When the shooting occurred, he was more than 1,500 miles away in Juana Diaz, Puerto Rico, where he had lived for the previous three years, raising his children, caring for his ailing mother, and working at a grocery store.

37.     Mr. Alicea has never been involved with drug dealing. Though married to one of Wilson Santiago's sisters, the two men did not have a close relationship. They did not spend time together or associate with the same people. Wilson Santiago was deeply enmeshed in the illegal drug economy, while Mr. Alicea was lawfully employed and devoted to raising his children.

**B.     Detectives immediately learn of the Santiago brothers' involvement.**

38.     On the day of the murders, defendant Detective Charles Brown was named the assigned detective and tasked with leading the investigation along with defendant Officer Miguel Deyne, a Spanish-speaking officer specially designated to the Homicide Division to investigate cases arising in neighborhoods with Spanish-speaking populations.

39.     Within hours of the shooting, Brown, Deyne, and their fellow detectives in the PPD Homicide Division learned from neighborhood sources that the Santiago brothers were the perpetrators of the crime.

40.     Defendants Brown, Deyne, and others involved with the investigation learned that Wilson Santiago ran a drug-trafficking business out of the candy store he owned. The Camacho brothers' bodies were found in front of that candy store.

41.     Based on their initial conversations with neighborhood sources, police made notes, stating: "Wilson's envolved" and "Gibby envolved and had guns."  "Gibby" was the

nickname for Jose DeJesus, who was Wilson Santiago's stepson. Police at the scene also wrote that Elsa, Wilson Santiago's wife and Jose DeJesus's mother, was the wife of the "doer."

42.     These handwritten notes containing three separate references to Wilson Santiago and his family were passed on to Brown and Deyne who, in turn, placed them into their investigative file—referred to as the "homicide file" or "H file"—on the Camacho brothers' murder investigation. These notes were never turned over to the prosecution or the defense in Mr. Alicea's trial.

43.     Defendants Brown and Deyne and the other defendant detectives who contributed to the investigation worked under the supervision of defendants Lieutenant Gibbons and Sergeant Joseph Descher. At various times throughout the investigation, the defendant detectives were also supervised by defendants Lieutenant James Hansen, Sergeant Robert Snyder, and Sergeant Frederick Westerman. Each of these supervisors learned of the information gathered by Brown, Deyne and other investigators pointing to the Santiago brothers' guilt.

44.     Soon after the murders, police learned from interviews of people in the neighborhood that another man, Saturnino Ramos, Jr.—Luis Camacho's brother-in-law—was present when Hector and Luis Camacho were shot. Ramos, police learned, fled the area immediately after the shooting, trailing blood to a nearby tire shop.

45.     Two days after the murders, defendants learned from Hector Camacho's widow Brunilda Camacho, about the drug-related circumstances leading up to the shooting. Brunilda Camacho reported to defendants Brown and Deyne that Saturnino Ramos and Luis Camacho had sold a large amount of bad quality cocaine and they had gone with Hector Camacho to the 2200 block of North 4th Street to discuss complaints about that bad cocaine. That encounter led to a

fight and, ultimately, the shooting. In a later interview with defendants Brown and Frank Miller, Brunilda Camacho provided background information about Wilson Santiago's extensive drug dealing, including that Wilson Santiago sold large quantities of cocaine from the candy store on North 4th Street and a building directly across the street.

46.     A week after the murders, defendants Brown and Deyne interviewed Saturnino Ramos. He admitted that he had been present at the scene of the murders, but he claimed he could not identify the shooter.

47.     Ramos was much clearer in a later conversation with the Camacho brothers' mother, Juana Camacho. He told Juana Camacho that Wilson Santiago and his brother got into an argument with her sons, and the brother shot them. Juana Camacho reported this information to the defendant officers on March 20, 1985.

48.     This information provided by Juana Camacho was fully consistent with what the defendant officers had been hearing for weeks: that Wilson Santiago was involved in the murders.

49.     Indeed, just two weeks after the murders, a detective took a call from an "anonymous Hispanic female" who stated, "The doer on this job is Wilson Santiago." The caller provided an address for Wilson Santiago of 2227 North 4th Street, next door to the location where the shooting took place. The caller's tip was reported in a written memorandum and forwarded to the lead detective, defendant Brown, and his supervisor, defendant Lieutenant Gibbons. But, as with much of the other information concerning the true perpetrators, defendants Brown and Gibbons never provided this information to the prosecution or defense.

**C. The Santiago brothers remain the primary suspects as the investigation fizzles.**

50. After the initial flurry of information pointing to Wilson and Manuel Santiago as the killers the investigation stalled. For months, there were no major investigative finds or action.

51. Another witness, Heriberto Ramirez, told police that he was at the scene. Over the course of two interviews with defendants Deyne, Martinez, and Miller, he claimed that he saw two people whom he knew as Freddy and Ray, commit the murders. Ramirez told the defendants that Freddy was the brother-in-law of Wilson Santiago.

52. Because this information was not consistent with any other information provided to the defendants, the Santiago brothers remained the prime suspects.

53. A memorandum prepared in this stage of the investigation by the defendant detectives in connection with a planned September 1985 grand jury appearance of Ramos (an appearance that never materialized) summarized the status of the case. The memorandum, which was never disclosed to anyone outside the PPD, identified two possible defendants: Wilson Santiago and Miguel Santiago (an apparent misnaming of Manuel Santiago). It noted that Wilson Santiago owned a store on the 2200 block of North 4th Street and that the shooting allegedly occurred over a drug deal in which Hector Camacho had gotten drugs from Wilson Santiago and did not pay Santiago the money he owed. The memorandum stated that Wilson Santiago's brother was alleged to be one of the shooters.

54. On October 23, 1985, defendants Brown and Miller attempted to interview Wilson Santiago, whom they identified as "the suspect" in their reports, and his stepson, Jose DeJesus—the man known as "Gibby" who witnesses had identified as a person who had guns at the scene of the shooting. Brown and Miller were only successful in locating Wilson Santiago's

wife, Elsa, who reported that Santiago was in Puerto Rico and would return to Philadelphia just a few days later. She told Brown and Miller that their lawyer would contact them.

55.     That contact, however, never happened. Despite the mountain of evidence pointing to the Santiago brothers as the perpetrators, the investigation stalled completely for nearly a year.

**D.      A highly reliable eyewitness, Maria Torres, identifies the Santiago brothers as the perpetrators, but the defendants fail to pursue them.**

56.     In October 1986, the defendant officers learned of another eyewitness to the crime, Maria Torres.  An informant, Isabel Rosa, brought Torres to the Homicide Division headquarters.  Torres stated that she was an eyewitness to the Camacho murders and confirmed what police had been hearing since the day of the shooting: that the Santiago brothers murdered the Camacho brothers.

57.     Officer Deyne reported that Torres was reluctant to talk to police for fear of retaliation.  After assurances that police would do all they could to protect her, Torres informed officers that she lived just a few houses north of Wilson Santiago's store. On the day of the shooting, she was looking out her second story window when she saw a man enter the store.  She did not know the man before that date but, by viewing a police photo, was able to identify him as one of the shooting victims, Hector Camacho.

58.     Torres reported that she heard what sounded like a heated argument between Wilson Santiago and Hector Camacho, and then she heard gun shots come from within the store. Torres stated that she saw Wilson Santiago drag a body out of the store on to the sidewalk.

59.     At that point, Torres stated, a man parked his car on North 4th Street, got out, and headed toward the store.  As with Hector Camacho, Torres did not know the man, but, by viewing a police photo, she identified him as the other shooting victim, Luis Camacho.

60.     Torres reported that Luis Camacho began walking toward Wilson Santiago at which point his brother, whom she knew as Manuel Santiago, shot Luis Camacho in the head.

61.     Consistent with earlier eyewitness accounts, Torres told the defendant police officers that Saturnino Ramos and Wilson Santiago's stepson Jose DeJesus, were both present at the scene.

62.     Torres also identified another potential eyewitness, a woman named Erika Wasilkowitz, whose presence had not previously been mentioned to police.

63.     Torres denied that her young daughter witnessed the shootings, but Isabel Rosa, the informant who brought Torres to the Homicide Division, had told detectives that the daughter did in fact witness the incident.

64.     The account provided by Torres was corroborated by—and consistent with—the bulk of the information the defendant police officers had already developed about the Camacho brothers' killings: Wilson and Manuel Santiago had shot the Camacho brothers outside of Wilson Santiago's candy store in the heat of an argument over their interconnected drug businesses, and Hector Camacho's brother-in-law Saturnino Ramos and Wilson Santiago's stepson Jose DeJesus were involved in the encounter.

65.     Deyne and other officers were also able to corroborate that Torres lived at 2235 N. 4th Street, just north of the location of the shooting, as she reported.

66.     Police also confirmed that a woman with the first name "Erica" lived on the same block, at 2247 North 4th Street, corroborating Torres's reference to Erika Wasilkowitz as an eyewitness.

67.     Officer Deyne recorded this information from Torres in a police activity sheet, a document used by homicide detectives to log their investigative work. Officer Deyne and

defendant Detective McGlothin began to prepare a formal statement for Torres, but did not complete it due to Torres's reluctance to provide information about the Santiago brothers.

68.    Torres's fears of retaliation, and the fact that she would not obtain any personal benefit from cooperating with police, gave police compelling reasons to find her identification of the Santiago brothers credible.

69.     Deyne noted in the activity sheet that police arranged to have Torres meet with Homicide Division detectives to prepare a formal statement four days later, on October 27, 1986.

70.    Deyne placed the activity sheet concerning Torres into the homicide file, making each of the defendant officers aware of this corroborated and credible eyewitness identification of Wilson Santiago and Manuel Santiago as the men who murdered the Camacho brothers.

71.    Despite the supposed plans to bring Torres back for another interview, and despite the defendants' knowledge of Torres's importance to the investigation, Torres was never brought back to the Homicide Division nor interviewed in any other location by police.

72.    Instead, after defendants' interview with Torres, there was no activity in the investigation for more than two years.

**E.    The defendant officers pressure and coerce witnesses to falsely identify Mr. Alicea as the shooter four years after the murders.**

73.    Almost four years after the Camacho brothers' murders, despite having reliable information—including highly credible eyewitness Maria Torres—pointing to the Santiago brothers' guilt, the defendants had failed to move the investigation forward against these true perpetrators.

74.    In January 1989, a known police informant named Angel Fuentes contacted Officer Deyne. Fuentes was in jail on multiple criminal charges and facing substantial prison time.

75.     Fuentes had a longstanding relationship with defendant Deyne, having assisted Deyne with multiple investigations.  Additionally, Deyne patronized businesses that Fuentes operated and considered him a friend.

76.     Believing Officer Deyne could assist him with his criminal cases, Fuentes asked his lawyer to arrange a meeting with Deyne in which Fuentes could provide information on outstanding cases in return for Deyne's intervention to reduce his time in prison.

77.     Deyne, knowing that the PPD was under significant pressure to close outstanding homicide cases, and knowing that no arrests had been made for the Camacho brothers' murders, agreed to meet with Fuentes and set out to feed him false testimony in order to frame a vulnerable target: Mr. Alicea.

78.     Mr. Alicea was the perfect foil for Deyne's stalled investigation.  Years earlier, Deyne had crossed paths with Mr. Alicea in connection with an arrest and prosecution that Deyne initiated.  Deyne lied to the court about his own conduct while arresting a man for unlawful possession of a firearm.

79.     Mr. Alicea had no personal connection to the man Deyne had arrested but happened to have observed his arrest and was called as a witness at his trial, where he testified that Deyne's account of the events was untrue. While Deyne falsely claimed the man, who was in the driver's seat, had been handling a firearm, Mr. Alicea testified truthfully that it was the passenger who had been handling the firearm, and the driver had not been holding a weapon. As a result of Mr. Alicea's testimony, Deyne's testimony was deemed not credible and the man whom Deyne had arrested was acquitted.

80.     In addition to the animosity borne out of Mr. Alicea's testimony undermining a prior arrest, the fact that Mr. Alicea was a brother-in-law of Wilson Santiago and, by early 1989,

lived in the neighborhood where the Camacho brothers were killed, provided a convenient connection to the crime.

81.     Although Wilson Santiago and Mr. Alicea were brothers-in-law, they did not share a close relationship. Mr. Alicea played no role in Wilson Santiago's drug trafficking and would have no reason to involve himself in a dispute over drug sales. And, of course, Mr. Alicea was not even present in Philadelphia at the time of Wilson Santiago's crime, and he had no knowledge of that crime.

82.     Despite these facts, the combination of Deyne's prior encounter with Mr. Alicea and the family relationship with Santiago was enough for defendants to zero in on him.

83.     On February 9, 1989, defendants Deyne and Snyder transported Fuentes from prison to the Homicide Division, where he met with defendants Deyne, Snell, and Ainsley.

84.     During their meeting, the defendants learned that Fuentes was acquainted with Mr. Alicea, whom he knew as "Tony," from the neighborhood.

85.     With this information in hand, defendants Deyne, Snyder, Snell, and Ainsley crafted a typewritten statement for Fuentes to sign falsely claiming that Fuentes was present when the Camacho brothers were shot, and falsely identifying Mr. Alicea as the person who shot and killed the Camacho brothers.

86.     In crafting the statement, the defendants knew that Fuentes's account would be subject to attack because none of the multiple witnesses interviewed had ever reported seeing Fuentes at the scene of the shooting.

87.     To provide a plausible explanation as to why none of the eyewitnesses ever reported to the police that Fuentes was present at the scene, the officers crafted the statement to

report that Fuentes saw the shooting while he was driving his truck by the scene, and that he drove off immediately after the shooting.

88.     At the conclusion of their meeting with Fuentes, defendants Deyne, Snyder, Snell, and Ainsley had Fuentes sign the statement adopting their fabricated account that Fuentes was an eyewitness to the Camacho brothers' murders and that Mr. Alicea was the person who shot the Camacho brothers.  In return, the defendants promised Fuentes they would ensure leniency in his pending criminal cases.

89.     Defendants Deyne, Snyder, Snell, and Ainsley fabricated the statement while knowing that the identification of Mr. Alicea as the perpetrator was inconsistent with corroborated facts discovered from multiple sources in 1985 and 1986—including from the highly credible Maria Torres—confirming that the shooter was Wilson Santiago's brother Manuel.

90.     As a result of their access to the homicide file and their knowledge that Santiago brothers were the true perpetrators of the murders, the other defendant detectives not directly involved in the meeting with Fuentes knew that the statement prepared for Fuentes to sign was false and directly inconsistent with corroborated information obtained through investigation in 1985 and 1986.

91.     To bolster their thin case against Mr. Alicea, defendants Snyder and Ainsley drove Fuentes to identify Mr. Alicea's home on the 100 block of East Ontario Street and then created false reports stating that the person who shot the Camacho brothers lived on that block.

92.     Defendants Snyder, Ainsley, and Snell then conducted a formal photo array procedure, showing Mr. Alicea's photograph to Fuentes, and again pressured him to falsely identify Mr. Alicea as the man who shot the Camacho brothers.

93. Defendants Deyne, Snyder, Ainsley, and Snell knew that the photo identification of Mr. Alicea as the shooter was false, just as they knew Mr. Alicea was not the shooter at the time they prepared Fuentes's statement implicating him.

94. On at least three different occasions, defendants Deyne, Snyder, Snell, and/or Ainsley documented that they would arrange for Fuentes to take a polygraph examination. But, aware that Fuentes could not pass a polygraph given the falsity of his statement, defendants did not conduct any such polygraph examination.

95. The defendants were aware that all of the real eyewitnesses to the Camacho brothers' murders would contradict Fuentes's identification of Mr. Alicea. Knowing that their failure to obtain corroboration of Fuentes's fabricated account would be used to question the integrity of their investigation, the defendants made a sham show of attempting to solidify their information by repeatedly documenting in their reports that they conducted additional interviews with known eyewitnesses, including Saturnino Ramos and Heriberto Ramirez.

96. At no time, however, did the defendants actually show a photo of Mr. Alicea to these eyewitnesses as they knew that doing so would undermine their effort to close the case with an arrest of Mr. Alicea.

**F.    Defendants continue to receive and disregard information confirming that the Santiago brothers are the real perpetrators.**

97. On March 15, 1989, while the defendants were in the process of preparing an arrest of Mr. Alicea, defendants Ainsley, Snell, and Deyne conducted an interview with Carlos Diaz, who was incarcerated and had informed police that he had information on outstanding homicide investigations.

98.     In the interview, Diaz explained to police that he knew Wilson Santiago and knew that Santiago had a motive to kill the Camacho brothers. This information confirmed the credibility of the evidence that had been in police files since the day of the murders.

99.     Diaz, in a signed statement, reported that he had been friends with the Camacho brothers and knew that they worked for Wilson Santiago making drug deliveries. Luis Camacho had told Diaz that he and his brother were stealing money from Santiago and that they had pulled guns on Santiago on previous occasions.

100.     According to Diaz, Wilson Santiago confirmed the Camacho brothers had been stealing from him. Diaz told the defendant officers that he heard Wilson Santiago say he was going to kill the Camacho brothers just a month before they were shot outside of his store.

101.     Diaz told the defendant officers in his interview that after the Camacho brothers were killed, he never asked Wilson Santiago about what happened because he was afraid. Diaz further explained that he knew Santiago always carried a pistol and he had seen him shoot a man in a bar on a prior occasion.

102.     This account from Diaz was highly significant. It informed the defendant officers about Wilson Santiago's motive to kill the Camacho brothers and described his plan to do so. It, therefore, provided compelling corroboration of the inherently reliable account provided two-and-a-half years earlier by Maria Torres, an eyewitness who had no incentive to help police with the investigation.

103.     When Carlos Diaz provided his March 15, 1989, statement to police, each of the defendants involved in the investigation—Ainsley, Brown, Descher, Deyne, Gibbons, Hansen, Martinez, McGlothin, Miller, Snell, Snyder, and Westerman—was, through personal involvement, through interactions with others involved in the investigation, and/or through

review of materials compiled in the homicide file, aware of multiple facts pointing to the guilt of

Wilson Santiago and his brother Manuel Santiago, including the following:

a. Eyewitness Saturnino Ramos's report to the victims' mother, Juana Camacho, that Wilson Santiago and his brother were arguing with the Camacho brothers and Santiago's brother shot the Camachos;

b. Maria Torres's identification of Wilson Santiago and Manuel Santiago as the perpetrators; and

c. Carlos Diaz's description of Wilson Santiago's motive and plan to kill the Camacho brothers based on longstanding conflict as well as Santiago's penchant for violence.

104. The defendants, however, having decided to fabricate a case against Mr. Alicea, willfully disregarded all information pointing to the guilt of Wilson and Manuel Santiago, and concealed the most significant evidence of their guilt to ensure it would not undermine their case against Mr. Alicea.

### G. Defendants initiate a false prosecution of Mr. Alicea and intentionally suppress information showing the Santiago brothers' guilt.

105. As a final step in their investigation before securing the arrest of Mr. Alicea, defendants sought to bolster Fuentes's false identification of Mr. Alicea by causing Jose DeJesus, Wilson Santiago's stepson, to adopt a fabricated statement implicating Mr. Alicea.

106. As police knew, DeJesus was present at the scene of the murders, and witnesses had reported that he had guns in his possession. Aware that DeJesus was motivated to protect himself and his stepfather from prosecution, defendants Ainsley and Deyne brought DeJesus to the Homicide Division for an interview and then prepared a false statement for him to adopt. This false statement mirrored the false statement defendants had prepared for Angel Fuentes the

month prior. The statement falsely reported that DeJesus claimed to see Mr. Alicea shoot Hector and Luis Camacho.

107.     As Ainsley, Deyne, and all of the other defendants knew he would, DeJesus endorsed the account the defendants prepared for him, protecting himself and his stepfather and turning the blame toward the innocent Mr. Alicea, with whom DeJesus had no relationship.

108.     Now, knowingly armed with two false statements implicating Mr. Alicea, one fabricated by defendants and adopted by Fuentes and another fabricated by defendants and adopted by DeJesus, the defendant detectives decided to seek Mr. Alicea's arrest.

109.     On March 22, 1989, shortly after DeJesus's interview, defendant Snell prepared an affidavit of probable cause in support of a warrant for Mr. Alicea's arrest. The affidavit cited only Fuentes's and DeJesus's fabricated statements.

110.     Defendant Snell, with the knowledge and acquiescence of the other defendants, intentionally omitted from the affidavit critical exculpatory information, including:

   a. Information identifying Wilson and Manuel Santiago as the perpetrators, including Maria Torres's eyewitness account and the eyewitness account of Saturnino Ramos, as reported by Juana Camacho;

   b. Information in the statement of Carlos Diaz explaining Wilson Santiago's history of violence and his motive and plan to kill the Camacho brothers;

   c. Information showing Fuentes's motive to lie given his substantial sentencing exposure in outstanding criminal matters;

   d. Information concerning Deyne and Fuentes's longstanding relationship;

   e. Information showing DeJesus's motive to lie to protect himself and his stepfather from prosecution; and

      f.   The fact that Fuentes's and DeJesus's statements were false and fabricated.

111.     On March 23, 1989, defendants Snyder and Ainsley met with a prosecutor in the Philadelphia District Attorney's Office to review defendant Snell's affidavit of probable cause. Snyder and Ainsley knowingly and intentionally did not provide the prosecutor with any of the above exculpatory information, leading the prosecutor to approve the affidavit of probable cause.

112.     The affidavit was presented to a bail commissioner who approved an arrest warrant for Mr. Alicea.

113.     On March 24, 1989, defendants Hansen, Ainsley, Snell, and Deyne went to Mr. Alicea's home to arrest him. They stormed in, with Deyne leading the group. Another officer put a gun to Mr. Alicea's neck, all while his young children looked on. Because Deyne was the only Spanish-speaking officer among them, and Mr. Alicea does not speak English, he was dependent on Deyne to explain what was happening to him.

114.     The officers brought Mr. Alicea to police headquarters, where Mr. Alicea told Officer Deyne that he had not committed any crime. Officer Deyne responded that he did not care and that the officers had decided that Mr. Alicea would be charged for murder. Officer Deyne then threatened Mr. Alicea that he would be going to prison for a long time, maybe for life, or that he may face the death penalty. He then refused to speak to Mr. Alicea in Spanish for the bulk of his detention at police headquarters, leaving him totally in the dark as this terrifying and bewildering experience unfolded.

115.     Mr. Alicea was formally charged with the murder of the Camacho brothers and remained in custody without bail.

116.     In order to prepare the case for trial, the defendant detectives selected materials from their homicide file and placed those materials in a separate file called a "homicide binder," which was used to transmit discovery information to the District Attorney's Office.

117.     In preparing that binder, the defendant detectives intentionally suppressed significant information that was exonerating and highly exculpatory to Mr. Alicea.  The suppressed information not made a part of the binder included:

    a.    Maria Torres's reliable identification of the Santiago brothers as the perpetrators of the shooting and Torres's identification of Erika Wasilkowitz as another eyewitness;

    b.    Informant Isabel Rosa's suggestion that Torres's daughter was an eyewitness;

    c.    Carlos Diaz's statement describing Wilson Santiago's previous violent behavior and motive and plan to kill the Camacho brothers;

    d.    That defendants had scheduled and cancelled at least three polygraph examinations of Fuentes; and

    e.    Multiple handwritten notes from the homicide file with references to anonymous reports that Wilson Santiago was the "doer."

118.     Because only the information in the homicide binder was transmitted to the District Attorney's Office, and, in turn, to Mr. Alicea's criminal defense counsel, the defendant detectives' suppression of the above information meant it was never disclosed to anyone outside the PPD.

119.     The defendant detectives, therefore, created an entirely false prosecution of Mr. Alicea by fabricating the only evidence that implicated him, and omitting any reference to information exculpating him and pointing to the true perpetrators.

**H.      Even after Mr. Alicea's arrest, defendants continue to fabricate evidence.**

120.    After Mr. Alicea's arrest, Fuentes voluntarily met with Mr. Alicea's defense attorney and walked back his identification.  In the presence of an investigator, Fuentes provided a tape-recorded statement in which he said in reference to Mr. Alicea, "I can't be sure that's the man."

121.    Fuentes's statement to Mr. Alicea's attorney was shared with the defendant detectives, who, knowing that their fabricated case against Mr. Alicea was at risk of unraveling, sought to produce additional evidence to support that case.

122.    On April 2, 1990, just weeks before the trial was scheduled, defendants Snyder and Deyne located Reinaldo Velez, known by the name "Ray," and took him into custody.

123.    They did so because in September 1985, Heriberto Ramirez, who told the defendants he was an eyewitness to the Camacho brothers' murders, had identified a man named "Ray" who lived in the area of Orianna and Diamond Streets as one of the two men involved in the shooting.  In 1985, Velez lived on the 2100 block of Orianna Street, just north of Diamond Street.

124.    After taking Velez into custody, defendants Snyder and Deyne told Velez that they believed he had a role in the Camacho brothers' murder.  They told Velez that they would charge him with the crime unless he adopted a false statement claiming that Mr. Alicea was the shooter.

125.    Defendants Ainsley and Deyne then prepared a false and fabricated written statement for Velez purporting to show that Velez independently identified Mr. Alicea as the person who shot the Camacho brothers.

126.    Velez, fearing prosecution for the crime, signed the statement.

## I.     Mr. Alicea is convicted based on the fabricated accounts of Fuentes and Velez.

127.     Mr. Alicea's case proceeded to trial starting on April 25, 1990, before Judge McKee, sitting without a jury.

128.     The only direct evidence introduced against Mr. Alicea came through the testimony of Fuentes and Velez.

129.     On direct examination, Fuentes, knowing that he needed to testify consistently with the fabricated statement created by the defendants in order to secure benefits in his outstanding criminal matters, testified that he was driving his truck on North 4th Street on February 19, 1985, when he saw Mr. Alicea shoot Hector Camacho and Luis Camacho.

130.     Velez also testified that Mr. Alicea was the shooter, but that he only shot the Camacho brothers in self-defense after the Camacho brothers approached him with guns. Velez departed from the statement the defendants had coerced him to sign in an attempt to protect Mr. Alicea from the consequences of his false identification due to his guilt over having accused an innocent man of a double murder. However, he still identified Mr. Alicea as the shooter out of fear that if he did not, he himself would be prosecuted for the Camacho brothers' murders, as the defendants had threatened.

131.     Mr. Alicea's defense did not have access to any of the information suppressed and concealed by the defendants, including reports concerning Maria Torres's reliable and corroborated identification of Wilson Santiago and his brother as the perpetrators.

132.     On the final day of trial, May 2, 1990, Judge McKee, having not heard any of the significant exculpatory information, found Mr. Alicea guilty of first-degree murder with respect to Hector Camacho and voluntary manslaughter with respect to Luis Camacho.

133.     On July 18, 1991, Mr. Alicea was sentenced to life imprisonment.

**J.** **Judge McKee orders a new trial based on the disclosure of information about deals between the defendant detectives and Fuentes.**

134. When the defendants fabricated a statement for Fuentes in early 1989, Fuentes was facing his own legal trouble. Fuentes had been convicted of a crime and deemed a fugitive for failing to turn himself in at the beginning of a work-release sentence following that conviction. Fuentes also had two other pending charges against him: a serious drug charge and an aggravated assault charge.

135. When Fuentes testified at Mr. Alicea's trial, he admitted on cross examination that he thought Deyne would help him with his own criminal case regarding his fugitive status in return for his cooperation against Mr. Alicea.

136. Fuentes repeatedly denied that he had ever met with his attorney and police or prosecutors to discuss a deal regarding his fugitive status and his testimony.

137. Defendant Deyne, however, testified that Fuentes did indeed receive some benefit from his cooperation with Mr. Alicea's case. Deyne explained in his trial testimony that he, along with an Assistant District Attorney and Fuentes's attorney, informed Judge Carolyn Engel Temin, the judge who imposed Fuentes's sentence, about Fuentes's cooperation. As a result, Judge Temin reinstated Fuentes's work-release sentence and, according to Deyne, noted that but for Fuentes's cooperation, she would have been inclined to sentence him to three to ten years imprisonment.

138. In a post-trial motion, Mr. Alicea, through new counsel, alleged that his trial counsel provided ineffective assistance of counsel by failing to call as a witness the attorney who represented Fuentes in negotiations with police.

139. At a hearing on the motion, Fuentes's lawyer's testimony established that the relationship between Deyne and Fuentes was much closer, and that the negotiations between Fuentes and police were much more extensive, than what was described in the trial evidence.

140. Additionally, Fuentes's attorney explained that Deyne had contacted him and asked him to meet Judge Temin who would make a determination regarding Fuentes's fugitive status.

141. During this meeting, Deyne vouched for Fuentes to Judge Temin. Deyne told the judge of his friendship with Fuentes, described Fuentes's business interests in North Philadelphia, and explained that Fuentes was willing to be an important witness for the prosecution in a homicide case.

142. It was only after Deyne made this presentation that Judge Temin agreed to reinstate the previously imposed work-release sentence.

143. The benefits to Fuentes extended well beyond the imposition of a new work-release sentence. Fuentes's lawyer explained that immediately following Fuentes's testimony at Mr. Alicea's preliminary hearing, Judge Temin granted Fuentes's petition requesting early parole from the work-release sentence.

144. A few weeks after Fuentes's full release from custody, Fuentes's lawyer approached Deyne and stated that any deal for Fuentes's testimony at Mr. Alicea's trial would have to ensure that Fuentes would not be incarcerated on either of the two additional charges he was facing or as a result of several open bench warrants for Fuentes's arrest.

145. According to Fuentes's lawyer, Deyne was aware of the open charges and bench warrants and promised that, while he could not obtain the dismissal of all charges, he could appear at any sentencing for Fuentes and testify on his behalf.

146. When Fuentes testified at Mr. Alicea's trial, there was still an open bench warrant from the case involving Fuentes's pending drug charges, but Fuentes was not in custody.

147. When Fuentes's lawyer asked Deyne to appear before the judge who had issued the bench warrant, Deyne not only agreed to do so, but also spoke with the assigned prosecutor before the hearing and advised of his view that incarceration was not appropriate for Fuentes in light of his assistance in Mr. Alicea's prosecution.

148. This testimony laid bare the factors that were in play from the time of Deyne and Fuentes's meeting that resulted in a statement implicating Mr. Alicea in the Camacho brothers' murder through the time of Fuentes's inculpatory testimony at trial:

    a. Fuentes and Deyne were tightly interconnected on a personal and professional level, with Fuentes providing information to Deyne in support of criminal investigations for more than ten years;

    b. Deyne was able to use Fuentes to endorse the evidence that would close the case of the Camacho brothers' murder, which Deyne had been investigating for four years;

    c. Fuentes reaped substantial benefits from his willingness to sign a false statement in that he was able to walk away with virtually no punishment despite repeated instances of criminal conduct and open arrest warrants which otherwise would have led to lengthy periods of incarceration; and

    d. Knowing that revealing the details of their relationship and the mutual benefits resulting from Fuentes's testimony would undermine his credibility and the integrity of the entire investigation, Deyne lied and/or intentionally

omitted information about those facts in his trial testimony, and pressured Fuentes to do the same.

149.     Based on this background, and in light of the fact that Mr. Alicea's trial counsel was aware of Fuentes's lawyer's ability to testify to these facts concerning Fuentes and Deyne, Judge McKee concluded that trial counsel had provided ineffective assistance in failing to call Fuentes's lawyer to testify at trial.

150.     On April 8, 1993, Judge McKee ruled that Mr. Alicea should receive a new trial. Central to Judge McKee's opinion was his conclusion as the finder of fact that the evidence against Mr. Alicea was so weak that the additional impeachment of Fuentes would have resulted in an acquittal as opposed to a conviction.

151.     This impeachment evidence was just one aspect of the case that had not been presented at trial.  Judge McKee, likewise, never heard any of the exculpatory and exonerating evidence pointing to the Santiago brothers as the real perpetrators of the shootings because the defendants had intentionally concealed and suppressed that information.

152.     At the time Judge McKee issued the opinion, Mr. Alicea's appeal was already pending in the Pennsylvania Superior Court and Judge McKee did not have jurisdiction to vacate the conviction.  For that reason, Judge McKee requested that the Superior Court remand the case to the Court of Common Pleas so that he could then enter an order granting Mr. Alicea a new trial.

153.      On November 24, 1993, however, the Superior Court overruled Judge McKee's request and affirmed Mr. Alicea's conviction and sentence.

**K.     For thirty years, Mr. Alicea attempts to prove his innocence and vacate his conviction.**

154.     With little knowledge of the law and no English proficiency, Mr. Alicea sought to challenge his conviction in multiple ways.

155.     He filed, with assistance from other prisoners, post-conviction petitions in the Pennsylvania courts in 2000, 2004, and 2008.

156.     In connection with that litigation, Mr. Alicea and his family obtained documentary proof showing that he could not have murdered the Camacho brothers for a simple reason: he was living and working Puerto Rico in February 1985.

157.     At the time of trial, Mr. Alicea's counsel did not ask him to produce any information concerning his whereabouts at the time of the murders.  Mr. Alicea, knowing he was innocent and trusting the advice of his counsel that he would be acquitted based only on a challenge to the credibility of the prosecution witnesses, did not seek to obtain documentary proof at that time.

158.     While preparing to challenge his conviction, Mr. Alicea secured multiple witness statements and supporting documents showing that he was living in Puerto Rico between 1982 and 1986.

159.     Significantly, those materials showed with specificity that he was working at a grocery store in Puerto Rico on the day the Camacho brothers were murdered in Philadelphia.

160.     Despite that evidence, all of Mr. Alicea's post-conviction petitions were denied on the ground that they were untimely filed.

161.     In 2016, Mr. Alicea filed a petition for writ of habeas corpus in this Court.  That petition was also denied on the ground that it was untimely filed.

**L.    The District Attorney's Office discovers suppressed information leading to Mr. Alicea's exoneration.**

162.    In November 2017, Mr. Alicea filed in this Court a motion under Federal Rule of Civil Procedure 60(b) asking the Court to readdress his previously dismissed habeas corpus petition based on what he contended was a change in relevant legal standards.

163.    The Philadelphia District Attorney's Office assigned an attorney in its appellate unit to prepare a response to that motion.

164.    The attorney, based on newly instituted office policy, obtained the PPD's homicide file from the Camacho brothers' murder investigation.

165.    In reviewing that file, the attorney discovered materials pointing to Wilson Santiago and his brother as the perpetrators of that offense.  Upon review of correspondence documenting the transmittal of discovery information, it appeared that critical information concerning the Santiago brothers had never been disclosed to Mr. Alicea and his trial counsel, and, further, that the most significant of this information—including the Maria Torres eyewitness identification of Wilson and Manuel Santiago—had never been shared with anyone outside the PPD.

166.    The attorney who located the information referred the case to the Conviction Integrity Unit (CIU) of the Philadelphia District Attorney's Office.

167.    The CIU initiated a comprehensive investigation of the case.  In December 2018, CIU lawyers sent the newly discovered information regarding the Santiago brothers to Mr. Alicea.  When he received it, he immediately knew that he had never seen it before.

168.    Mr. Alicea, with the assistance of counsel, initiated new post-conviction litigation. He cited as a basis for relief that newly received exculpatory evidence had not only been

suppressed but also that the evidence affirmatively proved his innocence and demonstrated that police had fabricated the statements by Fuentes and Velez used to prosecute and convict him.

169.    During the course of the post-conviction litigation, the CIU continued its investigation and concluded that the two most relevant pieces of evidence pointing to the Santiago brothers' involvement in the crime had been suppressed by the defendant detectives and hidden in the homicide file: (1) Maria Torres's eyewitness identification of Wilson and Manuel Santiago as the perpetrators and (2) Carlos Diaz's statement describing Wilson Santiago's motive, plan, and history of violence.

170.    As a result of its investigation, the CIU concluded that the suppressed information supported the granting of a new trial for Mr. Alicea, and, because it determined that there was not sufficient evidence to charge Mr. Alicea, it agreed to dismiss the charges.

171.    On October 23, 2020, after review of the CIU's briefing and concession to relief, the Philadelphia Court of Common Pleas entered an order vacating Mr. Alicea's conviction and granted a motion to *nolle prosse* the charges.

172.    Mr. Alicea was released from the Pennsylvania Department of Corrections on October 26, 2020, having spent thirty-one years and seven months in custody.

**M.    The defendants' conduct is caused by the PPD Homicide Division's established history of unconstitutional practices and the City's deliberate indifference to those practices.**

173.    The unconstitutional conduct of the defendant detectives described above was directly and proximately caused by a long-established history of practices in the PPD in general and specifically in the PPD Homicide Division.

174.    For many years dating back at least to the 1970s, and continuing well beyond the time of the investigation of the Camacho brothers' murders, the City of Philadelphia had

in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, concealing or withholding exculpatory evidence; using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; tampering with or manufacturing evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; and conducting improper identification procedures.

175. These practices were well known to the City of Philadelphia and its policymakers as a result of newspaper investigations including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

176. Various cases demonstrate that this misconduct was pervasive within the PPD at the time of the Camacho brothers murder investigation, Mr. Alicea's 1990 trial, and thereafter. The cases include the following:

   a. **Willie Stokes:** In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation, or, otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives who, in order to maintain control over their informant, arranged for him to have access

to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

b. **Curtis Crosland:** In 1987, PPD officers interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all of the information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Finally, as Crosland's 1989 trial approached, detectives pressured and coerced a vulnerable witness who suffered from mental health disorders and had attempted suicide to provide testimony asserting that Crosland had expressed fear about the

fact that an award offered to the community for information about the shooting would lead to an arrest. Crosland was convicted as a result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the CIU located the referenced exculpatory information in police files. In 2021, a federal district court accepted the CIU's concession that Crosland was entitled to relief and was likely innocent, and, therefore, vacated the conviction.

c. **Carlos Hernandez and Ed Williams**: PPD Homicide Division detectives coerced a false statement from a witness to a robbery and murder by detaining the witness without food or water for days and by beating the witness. That statement led to the 1991 arrests of Hernandez and Williams, but it was later proven that Williams had been in a secured-treatment facility at the time of the crime, thus undermining all of the evidence produced by the detectives as to both defendants.

d. **Jackie Combs Jr**.: PPD Homicide Division detectives coerced four young witnesses into falsely claiming that Combs committed a murder in 1990. Each witness later provided consistent accounts of the manner in which their false statements were secured: through the detectives' use of overwhelming physical and verbal abuse.

e. **Percy St. George:** A PPD Homicide detective coerced two people in 1993 to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-

incrimination and declined to answer questions. Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

f. **Donald Ray Adams:** PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony. In securing the statement, detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement.

g. **Andrew Swainson:** PPD Homicide Division detectives based their arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes. The witness identified Swainson in a photo array after he was threatened with arrest and shown a photo array that included seven different pictures of Swainson. Based on this evidence, among other instances of misconduct, in June 2020, Swainson's conviction was vacated and all charges were dismissed.

h. **Walter Ogrod:** PPD Homicide Division detectives obtained an alleged confession from Ogrod in 1988. Ogrod, who was intellectually compromised, had not slept for thirty-six hours before his interrogation. In his first trial, eleven of twelve jurors voted to acquit him, and he was

only convicted in a second trial when the prosecution introduced the testimony of a notorious jailhouse informant. Based on evidence of substantial police misconduct and Ogrod's innocence, in June 2020, his conviction was vacated and all charges were dismissed.

i. **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with an incontrovertible alibi. The detectives' conduct led to the Third Circuit's issuance of an *en banc* decision concluding that the concealment of evidence violated Dennis's due process rights. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 307 (3d Cir. 2016).

j. **Shaurn Thomas**: PPD Homicide Division detectives arrested Thomas in 1993 on charges that he was involved in a 1990 murder. Thomas had a documented alibi that he was present in juvenile court at the time the murder occurred, but based on testimony from another man who was involved in the murder, Thomas was convicted. In May 2019, the Philadelphia District Attorney's Office agreed to dismiss the charges after discovering, among other things, previously undisclosed information in police files showing that officers had questioned a suspect just following the crime who provided police non-public facts about the murder and failed a polygraph test. Thomas's civil rights suit resulted in a settlement for more than $4 million.

k. **Anthony Wright**: Wright was convicted of the 1991 rape and murder of

an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence. DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial. His subsequent civil rights action litigated in this Court resulted in a settlement of nearly $10 million.

l. **Walter Ogrod:** In 1992, PPD detectives coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Ogrod has since been exonerated, the charges *nolle prossed*, and he was released from prison after serving more than 25 years for a crime he did not commit.

m. **Willie Veasy:** Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force. The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder. Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office, and

his subsequent civil rights suit resulted in a multi-million-dollar settlement.

177.    As evidenced by the pervasive nature of the conduct in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

178.    At the time of the investigation of the Camacho brothers' murders and prosecution of Mr. Alicea between 1985 and 1990, the PPD had a policy, practice, or custom of concealing and withholding exculpatory evidence, introducing fabricated evidence, and initiating prosecutions without probable cause.

179.    In particular, in the mid-1980s, PPD initiated the use of "activity sheets" for the purpose of allowing detectives in the Homicide Division to make records regarding their work on an investigation.  Soon after the introduction of activity sheets as a form of recordkeeping for PPD investigations, detectives began using activity sheets to record information exculpatory to the person or persons detectives targeted as suspects.

180.    No one outside PPD was aware of PPD's use of activity sheets, let alone the use of activity sheets for the recording of exculpatory information.  Instead, activity sheets were used exclusively within the PPD, and the information recorded in those sheets was never shared with either the Philadelphia District Attorney's Office or members of the defense bar.

181.    Policymakers within the PPD were aware of these practices and, with deliberate indifference to the risk of constitutional violations, tolerated and ratified the practice.  As a result of these practices, defendants in homicide cases were routinely

deprived of exculpatory information.

182.    These practices, as exemplified by the investigations in Mr. Alicea's case and in those detailed above, continued for years due to the deliberate indifference of the City of Philadelphia.

183.    Additionally, during the 1980s and 1990s, and concurrent with the time of the investigation of this case by the PPD, there was a pattern, practice, and custom within the Department of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.

184.    On three separate occasions in the 1980s, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in such practices. *See Cliett v. City of Philadelphia,* No. 85-cv-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1,500 individuals through drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia,* 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in the Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia,* No. 88-cv-2264 (E.D. Pa. 1988) (enjoining stops, detentions, and searches of African-American men during investigation of the "Center City Stalker").

185.    Thereafter, in the late 1980s and early 1990s, a narcotics squad operating out of the 39th Police District engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the City of

Philadelphia, including the disregard of credible complaints to the PPD Internal Affairs Division and the District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

186.    These systemic and unconstitutional practices and customs were addressed only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office.

187.    As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicides for which Mr. Alicea was charged, and in light of evidence showing substantial racial bias in PPD practices, a Court in the Eastern District of Pennsylvania entered a Consent Decree requiring wide ranging reforms in the PPD, and in particular providing for specific limitations on PPD investigative practices and policies. *See NAACP v. City of Philadelphia,* No. 96-cv-6045.

188.    In summary, at the time of the investigation and prosecution of Mr. Alicea, the City of Philadelphia and its policymakers were deliberately indifferent to PPD's policy, practice, and custom of:

    a.    Concealing and/or failing to disclose exculpatory evidence, engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, and using improper identification procedures;

    b.    Using these practices to target people of color for unlawful treatment;

    c.    Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or

unconstitutional conduct and/or violated generally accepted police practices;

d.    Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

e.    Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

f.    Failing to properly sanction or discipline PPD officers who were aware of and concealed and/or aided and abetted violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Mr. Alicea.

189.    At the time of the investigation of the Camacho brothers' murders and the prosecution of Mr. Alicea, and for many years before and thereafter, the City of Philadelphia was deliberately indifferent to the need to train, supervise, and discipline police officers. Specifically, the Internal Affairs Division (IAD) of the PPD failed to provide an internal disciplinary mechanism that imposed meaningful disciplinary and

remedial actions in the following respects:

a.  Excessive and chronic delays in resolving disciplinary complaints;

b.  A lack of consistent, rational, and meaningful disciplinary and remedial actions;

c.  A failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.  A failure to establish an internal investigatory process that was not arbitrary and inconsistent;

e.  Imposing incident-based, rather than progressive discipline, resulting in the failure to penalize repeat violators;

f.  Failure to institute necessary training and supervision for IAD investigators in order to ensure proper investigations;

g.  Institution of investigative procedures which adopted a default position that officers had not violated any rules;

h.  Failing to institute any quality control measures to ensure valid IAD findings and conclusions;

i.  Failing to adopt an effective early warning system to identify, track, and monitor officers with significant disciplinary histories;

j.  Failing to interview available eyewitnesses to incidents involving citizen complaints of misconduct; and

k.  Failing to acknowledge the disproportionate and extreme use of violence and other improper conduct used by police officers.

190. Given all of the above, the City of Philadelphia, through its deliberate indifference, was a moving force in the violation of Mr. Alicea' constitutional rights.

**N. Mr. Alicea suffered, and continues to suffer, immense damages.**

191. Defendants' unlawful conduct outlined above caused Mr. Alicea to be improperly arrested, prosecuted, and imprisoned for more than thirty-one and a half years for a crime he did not commit.

192. As a direct and proximate result of defendants' actions and omissions, Mr. Alicea sustained injuries and damages, including loss of his freedom; loss of the most productive years of his adult life; pain and suffering; mental anguish; emotional distress; indignities; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

193. As a direct and proximate result of defendants' actions and omissions, Mr. Alicea was deprived of his familial relationships, including time with his spouse, children, and grandchildren.

194. As a direct and proximate result of defendants' actions and omissions, Mr. Alicea sustained economic injuries and damages, including loss of income and loss of career opportunities, as he was incarcerated during the most productive years of his adult life.

195. As a direct and proximate result of defendants' actions and omissions, Mr. Alicea sustained and continues to suffer physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

196.     As a direct and proximate result of defendants' actions and omissions, Mr. Alicea

sustained mental health injuries and damages, including adverse psychological symptoms,

mental anguish, and emotional distress, which he continues to experience to this day.

## V.     Causes of Action

### Count 1
### Plaintiff v. Defendants Ainsley, Brown, Descher, Deyne,
### Gibbons, Hansen, Martinez, McGlothin, Miller, Snell, Snyder, and Westerman
### Fabrication of Evidence

197.     Defendants Ainsley, Brown, Descher, Deyne, Gibbons, Hansen, Martinez,

McGlothin, Miller, Snell, Snyder, and Westerman fabricated evidence in support of a

prosecution against Mr. Alicea and/or aided and abetted the introduction of fabricated evidence.

The fabrication of this evidence caused Mr. Alicea's wrongful conviction and, therefore, violated

his right to a fair trial and due process of law under the Fourteenth Amendment to the U.S.

Constitution.

### Count 2
### Plaintiff v. Defendants Ainsley, Brown, Descher, Deyne,
### Gibbons, Hansen, Martinez, McGlothin, Miller, Snell, Snyder, and Westerman
### Malicious Prosecution

198.     Defendants Ainsley, Brown, Descher, Deyne, Gibbons, Hansen, Martinez,

McGlothin, Miller, Snell, Snyder, and Westerman caused the initiation of a prosecution against

Mr. Alicea without probable cause and with malice.  The criminal charges they caused to issue

against Mr. Alicea were terminated favorably to Mr. Alicea.  These defendants, therefore,

subjected Mr. Alicea to a malicious prosecution in violation of the Fourth and/or Fourteenth

Amendments to the U.S. Constitution.

**Count 3**
**Plaintiff v. Defendants Ainsley, Brown, Descher, Deyne,**
**Gibbons, Hansen, Martinez, McGlothin, Miller, Snell, Snyder, and Westerman**
**Deliberate Suppression of Exculpatory Evidence**
s
199.     By intentionally concealing and deliberately suppressing exculpatory evidence,

defendants Ainsley, Brown, Descher, Deyne, Gibbons, Hansen, Martinez, McGlothin, Miller,

Snell, Snyder, and Westerman violated Mr. Alicea's right to due process of law under the

Fourteenth Amendment to the U.S. Constitution.

**Count 4**
**Plaintiff v. Defendant City of Philadelphia**
**Municipal Liability**

200.     Defendant City of Philadelphia, with deliberate indifference, adopted and/or

acquiesced in policies, practices, and customs which were a moving force in the violation of Mr.

Alicea' constitutional rights, and, further, defendant City of Philadelphia, with deliberate

indifference, failed to properly train, supervise, and/or discipline officers and, as such, was a

moving force in the violations of Mr. Alicea's constitutional rights.

**Count 5**
**Plaintiff v. Defendants Ainsley, Brown, Descher, Deyne,**
**Gibbons, Hansen, Martinez, McGlothin, Miller, Snell, Snyder, and Westerman**
**Supplemental Claim – Malicious Prosecution**

201.     Defendants Ainsley, Brown, Descher, Deyne, Gibbons, Hansen, Martinez,

McGlothin, Miller, Snell, Snyder, and Westerman as described above, caused the malicious

prosecution of Mr. Alicea, and, as such, committed the tort of malicious prosecution under the

laws of the Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiff Pedro Alicea respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to defendants Ainsley, Brown, Descher, Deyne, Gibbons, Hansen, Martinez, McGlothin, Miller, Snell, Snyder, and Westerman;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
ID No. 88227

/s/ Grace Harris
Grace Harris
ID No. 328968

KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400

/s/ Emma Freudenberger
Emma Freudenberger*
Christina Matthias (ID No. 326864)

NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

*Counsel for Plaintiff*

\* *Pro hac vice* application forthcoming